IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA CHRISTINE LESSIG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO.  22-3170 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                        April 12, 2024

Lisa Christine Lessig ("Plaintiff") seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On February 24, 2015, Plaintiff protectively filed a DIB application, alleging that she became disabled on October 28, 2007, as a result of fibromyalgia, depression, anxiety, keratoconus, chronic fatigue, polycystic ovarian syndrome, and migraines.  Tr. at 212, 373, 425.[2]  The application was denied initially on September 2, 2015, id. at 254,

---

[1]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]Plaintiff amended her alleged onset date to February 18, 2014, at the administrative hearing held on July 14, 2020.  Tr. at 55, 409.  To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earning Record indicates and the ALJ

and Plaintiff requested an administrative hearing, id. at 262, which took place on

November 13, 2017.  Id. at 82-121.  On December 27, 2017, the ALJ found Plaintiff was

not disabled.  Id. at 230-42.  On October 29, 2019, the Appeals Council granted

Plaintiff's request for review and remanded the case to the ALJ to (1) to obtain evidence

from a medical expert, if available, regarding the nature and severity of Plaintiff's

functional limitations, (2) consider the medical severity of Plaintiff's impairments to

determine if she meets or equals a listing, (3) give further consideration to Plaintiff's

maximum residual functional capacity ("RFC"), providing rationale with specific

reference to the evidence of record, and (4) if warranted, obtain supplemental vocational

testimony/evidence.  Id. at 250-52.

On remand, a different ALJ held an administrative hearing on July 14, 2020.  Tr.

at 49-80.  On November 9, 2020, the ALJ found that Plaintiff was not disabled.  Id. at 24-

39.  On June 9, 2022, the Appeals Council denied Plaintiff's request for review, id. at 1-4,

making the ALJ's November 9, 2020 decision the final decision of the Commissioner.  20

C.F.R. § 404.981.  Plaintiff commenced this action in federal court on August 9, 2022,

Doc. 1, and the matter is now fully briefed and ripe for review.  Docs. 11-13.[3]

---

found that Plaintiff was insured through June 30, 2016.  Tr. at 26, 59, 406.  Thus, the
relevant period is from February 18, 2014 through June 30, 2016.
    I will define the relevant medical conditions in the discussion of the medical
evidence.

    [3]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

## II.    LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the RFC to perform her past work; and
>
> 5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff had the severe impairments of fibromyalgia, migraine headaches, pseudotumor cerebri, obesity, depression, and anxiety disorder.  Tr. at 26. The ALJ further found that Plaintiff's gastroesophageal reflux disease, allergic rhinitis, and loss of visual acuity were non-severe impairments, and that her and post-traumatic stress disorder ("PTSD") was not medically determinable.  Id. at 27.  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled

4

the Listings, id., and that she had the RFC to perform sedentary work, except she could lift/carry up to 20 pounds occasionally, 10 pounds frequently; sit for 6 hours, stand for 2 hours, and walk for 2 hours; occasionally push/pull with her lower extremities; frequently handle/finger/feel bilaterally; never kneel, crouch, crawl, or climb ladders/ropes/scaffolds; occasionally balance, stoop, and climb ramps/stairs; never work at unprotected heights; no exposure to machinery; occasional exposure to humidity, wetness, vibrations, and extreme cold/heat; exposure to moderate noise; simple routine tasks; and simple work-related decisions. Id. at 29. Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a high school or middle school teacher, but could perform the representative jobs of drafter, order clerk, and table worker. Id. at 37-38. Therefore, the ALJ found that Plaintiff was not disabled. Id. at 39.

Plaintiff claims the ALJ failed to (1) abide by the Appeals Council's remand order directing her to obtain evidence from a medical expert, (2) properly consider the nature and severity of Plaintiff's migraines, (3) properly consider the opinion of a consultative examiner, (4) include a limitation to carrying out very short and simple instructions in the RFC assessment without explanation, and (5) include all credibly established limitations in the RFC assessment and hypothetical. Docs. 11 & 13. Defendant responds that the failure to obtain a medical expert does not require remand because the ALJ's decision is supported by substantial evidence and the ALJ properly considered Plaintiff's headaches and the opinion evidence. Doc. 12

**B.**   **Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on September 17, 1984, and thus was 29 years old on her amended disability onset date (February 18, 2014), and 31 on her date last insured for purposes of DIB (June 30, 2016).  Tr. at 89, 373.  She has a bachelor of science degree and completed two graduate courses, id. at 58, 90, and has past relevant work as a middle school and high school teacher.  Id. at 91-92.

When the ALJ asked Plaintiff why she could not work at the first administrative hearing, Plaintiff explained that her fibromyalgia causes "soreness, achiness, almost flu-like" symptoms.  Tr. at 93.  In addition, Plaintiff testified that the fibromyalgia causes her to "get a little foggy and have trouble remembering."  Id. at 90.  She also suffers from migraines related to her fibromyalgia, causing pain requiring her to be in a room that is dark and quiet.  Id. at 93.  Plaintiff testified that she has migraines four times a month, lasting for hours, "I usually have to sleep them off."  Id. at 98.[4]  Plaintiff described her pain (from fibromyalgia and/or migraines) as constant, but at different levels throughout the day.  Id. at 94.  Stress, lack of sleep, too much activity, and weather exacerbate her

---

[4]At the second administrative hearing, Plaintiff testified that the severity and frequency of her migraines were the reason she could not work, explaining that she suffers from two different types of migraines.  Tr. at 60, 63.  The pseudotumor cerebri headaches cause double vision and pain when she looks left to right or up and down.  Id. at 60-61.  With typical migraines, the pain is severe and she has to lay down in a dark room because both noise and light bother her, and she suffers from nausea.  Id. at 61, 70.  She has been hospitalized once or twice a year for headaches.  Id. at 63.  Plaintiff testified that she believed that the combination of mental health challenges and migraines prevented her from working.  Id.

pain.  Id. at 97.  Plaintiff takes tramadol, gabapentin, and Flexeril[5] for pain and muscle spasms.  Id. at 94.[6]  With gabapentin and Flexeril, Plaintiff said she has pain at 6 out of 10 and the Tramadol lowers that to 4.  Id. at 95.

Plaintiff also testified that she suffers from depression and a history of agoraphobia.  Tr. at 98.  She has crying spells once a month. Id. at 106.  Generally, Plaintiff gets along with others, but suffers from anxiety attacks when she feels her heart race and is short of breath "once every couple months."  Id. at 108-09.

Plaintiff testified that she naps twice a day (1 to 2½ hours each time) when caring for her daughter.  Tr. at 96.  Plaintiff testified that she can lift 10-15 pounds, sit for about an hour before needing to stand up, stand for about 20 minutes at a time, and walk about a block.  Id. at 97-98.[7]  Plaintiff cooks at home once a week, but prepares her daughter's food every day, including steaming vegetables, using the Instant Pot, and scrambling eggs.  Id. at 99.  Plaintiff loads the dishwasher every day, cleans the countertops and

---

[5]Tramadol (brand name Ultram) is a synthetic opioid used to treat moderate to severe pain that is not relieved by other types of medicines.  See https://www.drugs.com/tramadol.html (last visited Mar. 20, 2024).  Gabapentin (brand name Neurontin) is an anticonvulsant, used to treat partial seizures, nerve pain from shingles, and restless leg syndrome.  See https://www.drugs.com/gabapentin.html (last visited Mar. 20, 2024).  Flexeril is a muscle relaxant.  See https://www.drugs.com/flexeril.html (last visited Mar. 20, 2024).

[6]Plaintiff explained that she does not take tramadol when she is caring for her daughter or has to drive because it makes her very groggy.  Tr. at 94.

[7]At the first administrative hearing, Plaintiff's daughter was 14 months old, tr. at 90, and weighed 23 pounds.  Id. at 98.  Plaintiff testified that lifting her daughter hurt her back.  Id.  I note, however, that Plaintiff did not give birth to her daughter until August 20, 2016, id. at 3987, nearly two months after her insured status expired.  See id. at 406 (DLI is June 30, 2016).

dusts twice a month, and can use a vacuum on better days.  Id. at 99-100.  Although

Plaintiff's husband carries the laundry baskets, Plaintiff does put loads of wash in and

sometimes folds it.  Id. at 100.  She drives once a week to doctors' appointments or to run

errands.  Id. at 101.

At the more recent administrative hearing, Plaintiff testified that she has problems

using her hands due to fibromyalgia.  Tr. at 65.  At that hearing, a VE classified

Plaintiff's teaching jobs as light skilled work.  Id. at 74-75  The ALJ asked the VE a

series of hypotheticals, in each, asking the VE to consider someone of Plaintiff's age,

education, and work experience.  Id. at 75-76.  First, the person was limited to light work,

except for sitting 6 hours, standing 4 hours, walking 4 hours; occasionally pushing

pulling with lower extremities; never climbing ladders, ropes or scaffolds; occasionally

balancing, stooping kneeling, crouching, crawling, and climbing ramps and stairs; never

work at unprotected heights; occasionally exposed to moving machinery, humidity,

wetness, vibrations and extreme cold and heat.  Id. at 75.  The VE said such a person

could not perform Plaintiff's teaching jobs, but identified other jobs such a person could

perform.  Id. at 75-76.  Then, the ALJ asked the VE to consider the first hypothetical, but

change the standing and walking to 2 hours, with the ability to frequently handle, finger,

and feel with both hands, but never kneel, crouch, or crawl, with no exposure to

machinery.  Id. at 76.  The VE responded that there were sedentary jobs that would fit

these limitations, including addresser, order clerk, and table worker, and that each of

these positions was unskilled.  Id. at 77.

C.   **Summary of the Medical Record**[8]

Plaintiff has a history of migraine headaches and fibromyalgia.  Tr. at 742, 768,

816.  She also has a history of pseudotumor cerebri syndrome ("PTCS"),[9] id. at 845, and

on December 10, 2012, Kelly A. Geary, D.O., indicated that Plaintiff was at the

beginning stages of the condition, associated with rapid weight fluctuation over a short

period of time.  Id. at 833-34.  She also has a history of anxiety and depression.  Id. at

768.  Just prior to Plaintiff's amended disability onset date, her primary care physician,

Rodger F. Rothenberger, M.D., noted that Plaintiff is "[d]oing much better mentally and

physically."  Id. at 786.  Dr. Rothenberger noted that Plaintiff treated with rheumatologist

Dr. Whalen every 6 week for fibromyalgia, and with Dr. Geary for migraines for which

she was prescribed Topamax.[10]  Id.

At the more recent administrative hearing, counsel explained that Plaintiff suffers

from two different types of headaches, migraines and those caused by intracranial

_____

[8]The relevant period in this case is February 28, 2014, Plaintiff's amended alleged onset date until June 30, 2016, her date last insured ("DLI").  A significant amount of information in the administrative record pre-dates or post-dates this period.  I have reviewed the evidence in its entirety and refer to evidence outside the relevant period as necessary to provide context.

[9]Pseudotumor cerebri is "a condition of raised intracranial pressure with normal cerebrospinal fluid, in the absence of an intracranial mass, hydrocephalus, or other identifiable cause; symptoms include headache, nausea, vomiting, papilledema, and sometimes pulsative tinnitus."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1546.

[10]Topamax is an anticonvulsant used to prevent migraine headaches.  It will not treat a headache that has already begun.  See https://www.drugs.com/topamax.html (last visited Mar. 20, 2024).

hypertension known as PTCS.  Tr. at 56.  On February 18, 2014, Plaintiff's amended

alleged disability onset date, she sought treatment at Phoenixville Hospital's emergency

department for a severe headache.  Id. at 2120.  Plaintiff was diagnosed with increased

intracranial pressure secondary to PTCS and the pressure was relieved by a lumbar

puncture and the removal of fluid.  Id. at 2121.  Plaintiff was released with a prescription

for Percocet,[11] id. at 2122, but returned the following day complaining of an

"excruciating" headache and double vision.  Id. at 2109.  Plaintiff was transferred to the

Hospital at the University of Pennsylvania ("HUP"), where she was diagnosed with a

combination of PTCS headache and migraine.  Id. at 527, 2114.  Plaintiff was treated

with Toradol, Reglan, and IV fluids.[12]  Id. at 527.  Plaintiff was discharged on February

21, 2014, with a prescription for acetazolamide (Diamox).[13]  Id. at 526.  On April 1,

2014, Plaintiff followed up with neurologist Grant T. Liu, M.D., who treated Plaintiff at

HUP.  Id. at 591-92.  Dr. Liu noted that Plaintiff's headaches were better on Diamox, but

that she had headaches when she reads.  Id. at 591.  Dr. Liu explained that the recurrent

---

[11]Percocet is a combination of oxycodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone.  See https://www.drugs.com/percocet.html (last visited Mar. 20, 2024).

[12]Toradol is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/toradol.html (last visited Mar. 20, 2024).  Reglan helps to treat nausea.  See https://www.drugs.com/reglan.html (last visited Mar. 20, 2024).

[13]Diamox (generic acetazolamide) blocks the carbonic anhydrase protein, which helps reduce the build-up of certain fluids in the body.  See https://www.drugs.com/mtm/diamox.html (last visited Mar. 20, 2024).

PTCS was related to Plaintiff's 20-30 pound weight gain.  Id.[14]  On May 29, 2014, Plaintiff reported to the Phoenixville Hospital emergency department that, while driving, she turned, felt pain in her neck which "started a migraine."  Id. at 2107.  She was diagnosed with a tension headache and dehydration and released.  Id. at 2108.

On July 29, 2014, Plaintiff was seen at the Phoenixville Hospital emergency department for complaints of diplopia (double vision), photophobia (light sensitivity), and pressure in her right eye.  Tr. at  2071, 2075.  Harry Chen, M.D., performed a lumbar puncture to relieve increased intracranial pressure.  Id. at 2088.  Plaintiff said the migraine had increased as a result of the procedure.  Id.  Plaintiff was diagnosed with a tension headache and dehydration and discharged later that day.  Id. at 2082.

On October 4, 2014, Plaintiff was seen at the Phoenixville Hospital emergency department for a headache characterized by pressure.  Tr. at 2052.  A CT scan showed no intracranial abnormality.  Id. at 2055.  Plaintiff was diagnosed with a PTCS headache and discharged with instructions to follow up with Dr. Liu.  Id. at 2064.

---

[14]On December 13, 2011, Plaintiff underwent laparoscopic adjustable gastric band placement ("Lap-Band") surgery.  Tr. at 1509-10.  On June 11, 2012, Plaintiff was admitted to Pennsylvania Hospital complaining of abdominal pain after an adjustment to her Lap-Band.  Id. at 1535.  She was admitted and underwent band deflation surgery and was discharged on June 13, 2012.  Id.  At her appointment with Dr. Liu on April 1, 2014, the doctor noted her weight as 301 pounds and noted a 20-30 pound weight gain over the prior year.  Id. at 591.  On May 6, 2014, Plaintiff underwent laparoscopic removal of the gastric lap band and conversion to sleeve gastrectomy.  Id. at 1884.  On October 6, 2014, Plaintiff's weight was 230, and on November 21, 2014, Plaintiff's weight was 237.  Id. at 558.

On October 6, 2014, Dr. Liu noted that Plaintiff had undergone gastric sleeve weight loss surgery in May 2014 and had lost 61 pounds.  Tr. at 589.  He noted that she had been seen two weeks prior at Scheie Eye Institute complaining of diplopia and blurry vision with photophobia and phonophobia.  Id.  She described the pain as similar to her PTCS symptoms and unlike the migraines which occur "at most once per month."  Id.  Dr. Liu discontinued Diamox and referred Plaintiff to a headache specialist at Lehigh.  Id. at 590.

On October 11, 2014, Plaintiff was seen at the Phoenixville Hospital emergency department for a headache, after tramadol did not alleviate the pain.  Tr. at 2037-39.  She was diagnosed with a migraine, and discharged with a prescription for Percocet and Zofran.[15]  Id. at 2048.

Plaintiff returned to see Dr. Liu on November 21, 2014, complaining of persistent monocular double vision and left upper eyelid pain.  Tr. at 587.  Dr. Liu found nothing on examination to explain her symptoms and again suggested that she see a headache specialist at Lehigh.  Id.  In a letter to Dr. Rothenberger, Dr. Liu stated, "[w]e are happy to see that [Plaintiff's] PTCS has resolved with her weight loss."  Id. at 920.

Plaintiff was seen at Paoli Hospital's emergency department on February 8, 2015, for complaints of a migraine with photophobia, nausea, and vomiting.  Tr. at 678.  She was treated with Reglan, Toradol, and IV fluids, and discharged.  Id. at 679, 684.  She was admitted to Paoli Hospital on February 27, 2015, with complaints of a headache that

---

[15]Zofran blocks the actions of chemicals in the body that can trigger nausea and vomiting.  See https://www.drugs.com/zofran.html (last visited Mar. 20, 2024).

she described as more like a PTCS headache.  Id. at 660-61.  A CAT scan was

unremarkable and a lumbar puncture evidenced a high intracranial pressure of 42.  Id. at

661.  Plaintiff was started on Diamox and treated with IV morphine and Fioricet.[16]  Id.

Thomas H. Graham, M.D., started Plaintiff on prednisone[17] and she was headache free on

February 28, 2015, and released.  Id. at 657-58.   On March 2, 2015, Plaintiff was again

admitted for headache pain, for which she was treated with Zofran, Reglan, Ativan, IV

fluids, and Benadryl with no relief.[18]  Id. at 636.  She responded well to DHE

(dihydroergotamine) and was discharged on March 5, 2015.[19]  Id. at 634-35.[20]

---

[16]Fioricet is a combination of acetaminophen, a pain reliever, butalbital, a barbiturate that relaxes muscle contractions involved in a tension headache, and caffeine, a central nervous system stimulate that relaxes muscle contraction in blood vessels to improve blood flow.  Fioricet is used to treat tension headaches caused by muscle contractions.  See https://www.drugs.com/fioricet.html (last visited Mar. 20, 2024).

[17]Prednisone is a corticosterioid used to decrease inflammation.  See https://www.drugs.com/prednisone.html (last visited Mar. 20, 2024).

[18]Ativan is a benzodiazepine used to treat insomnia, nausea and vomiting.  See https://www.drugs.com/ativan.html (last visited Mar. 20, 2024).  Benadryl is used to treat nose stuffiness, allergy symptoms, and to ease pain and fever.  See https://www.drugs.com/cdi/benadryl-allergy-cold-acetaminophen-diphenhydramine-and-phenylephrine-tablets.html (last visited Mar. 20, 2024).

[19]DHE is used to treat migraine headaches that have already begun.  It will not prevent headaches or reduce the number of attacks.  See https://www.drugs.com/mtm/dihydroergotamine-nasal.html (last visited Mar. 20, 2024).

[20]On June 10, 2015, Plaintiff was seen at the Phoenixville Hospital emergency department for neck pain on the left side that had been worsening for the prior two years.  Tr. at 2019.  A CT scan did not show evidence of traumatic injury.  Id. at 2033.  Plaintiff was discharged with Lidoderm topical film.  Id. at 2031.

On April 14, 2015, Plaintiff was seen at Paoli Hospital for a headache.  Tr. at 928.
Plaintiff reported that she had not used Imitrex[21] in many years because her headaches
were responsive to Excedrin.  Id.  A lumbar puncture revealed elevated intracranial
pressure, but Barry Fabriziani, D.O., felt the headache was migrainous and prescribed
prednisone.  Id. at 926.[22]

Both types of headaches persisted beyond the expiration of Plaintiff's insured
status.  See id. at 2680, 2686 (2/15-17/17 – Lehigh  Valley Hospital Cedar Crest
("LVHCC") – (admitted with PTCS headache, lumbar puncture reduced pressure), 2932,
2936, 2938 (5/30/17 – LVHCC – PTCS headache – pressure relieved with lumbar
puncture – Plaintiff was taking half the prescribed dose of Diamox due to dry mouth),
2352 (6/8/17 – LVPG Neurology – describing migraines as infrequent and manageable
and aborted with Excedrin or rest until February 2017), 3041, 3048 (6/17/18 – LVHCC –
PTCS headache – pressure relieved with lumbar puncture – resolved with low dose

---

[21]Imitrex is a headache medicine that narrows blood vessels around the brain and
reduces substances in the body that can trigger headache pain, nausea, sensitivity to light
and sound, and other migraine symptoms.  It is used to treat migraine headaches, but will
not prevent headaches or reduce the number of attacks.  See
https://www.drugs.com/imitrex.html (last visited Mar. 20, 2024).

[22]Dr. Rothenberger's treatment notes for the remainder of 2015 through Plaintiff's
DLI do not evidence any complaints of headaches.  See 1078 (6/11/15 – shoulder pain),
1077 (6/18/15 – follow up after CT, complain of worsening fatigue), 1075 (7/29/15 –
needs Paxil refill), 1073 (12/16/15 – same), 1072 (2/17/16 – 12 weeks pregnant with a
sinus infection), 1070 (6/22/16 – 30 weeks pregnant with sinus pressure).

ketamine and Zomig[23]), 4912 (3/22/19 – migraine headache treated with fentanyl[24] and

Toradol, but concern that she is not followed by a physician for PTCS), 4994, 4998, 5007

(3/25/19 – PTCS headache, lumbar puncture to relieve pressure, treated with fentanyl,

Reglan), 5077 (3/30 – 4/5/19 – LVHCC – combination migraine and tension type

headache improved with Diamox, decadron, Depakote, Neurontin, Flexeril, roboxin,

Compazine, benadryl, Imitrex, and DHE)[25], 5422, 5467 (4/26/19 -  unspecified headache,

treated with Benadryl, Toradol, Compazine), 6074 (3/29/19 - LVPG Neurology – follow

up – complains of migraines twice a month until recently – increase Diamox add

Decadron), 6095-96 (4/10/19 – LVPG Neurology – infusion therapy day 1 of Zofran,

Benadryl, Toradol, and DHE), 6109 (4/11/19 – LVPG Neurology – infusion therapy day

2).

---

[23]Ketamine is an anesthetic used to put you to sleep for surgery and to prevent pain and discomfort.  See https://www.drugs.com/ketamine.html (last visited Mar. 20, 2024). Zomig is a headache medicine that narrows blood vessels around the brain and reduces substances in the body that can trigger headaches, pain, nausea, sensitivity to light and sound, and other migraine symptoms.  Zomig will only trat a migraine that has already begun.  It will not prevent headaches or reduce the number of attacks.  See https://www.drugs.com/zomig.html (last visited Mar. 20, 2024).

[24]Fentanyl is an opioid used to treat moderate to severe pain.  It is a synthetic opioid that is up to 100 times stronger than other opioids.  See https://www.drugs.com/fentanyl.html (last visited Mar. 20, 2024).

[25]Decadron is a steroid that prevents the release of substances in the body that cause inflammation.  See https://www.drugs.com/mtm/decadron.html (last visited Mar. 20, 2024).  Depakote is used to prevent migraine headaches.  See https://www.drugs.com/depakote.html (last visited Mar. 20, 2024).  Robaxin is a muscle relaxer.  See https://www.drugs.com/robaxin.html (last visited Mar. 20, 2024). Compazine is used to treat nervous, emotional, and mental conditions and non-psychotic anxiety, and also used to control severe nausea and vomiting.  See https://www.drugs.com/search.php?searchterm=Compazine (last visited Mar. 20, 2024).

During the relevant period, Plaintiff treated with Whalen Rheumatology Group. Tr. at 2369-73 (5/23/14-10/13/14).[26]  On May 23, 2014, Thomas J. Whalen, D.O., noted that Plaintiff had fallen, landing on her palms and left knee.  Id. at 2369.  He indicated that she had moderate pain in the cervical and lumbar spine, shoulder, elbow, wrist, hand, hip, knee, ankle, and foot, with decreased grip strength and spasm in the lumbar spine. Id. at 2370.  He planned to perform a left shoulder injection and noted that Plaintiff was totally disabled.  Id.  On May 30, 2014, Plaintiff complained of an increase in neck and left arm pain, and Dr. Whalen prescribed Dilaudid, Soma, and Pennsaid,[27] and requested a cervical MRI.  Id. at 2371.  On June 13, 2014, Plaintiff complained of increased migraines and also neck pain with radiculopathy estimated to be 9/10.  Id.  at 2372.  The doctor noted Plaintiff's cervical and shoulder range of motion ("ROM") was 75% of normal with pain and spasm, and MCPs (knuckles) ROM was 90% of normal with pain to palpation.  Id.  The doctor renewed prescriptions for Dilaudid, Soma, and Pennsaid, and requested a cervical MRI.  Id.

On October 13, 2014, Plaintiff complained to Dr. Whalen of increased migraines, noting three recent ER visits.  Tr. at 2373.  The doctor's musculoskeletal exam revealed

---

[26]There are additional records from the Whalen Rheumatology Group in this exhibit, but they predate Plaintiff's amended alleged onset date.  Those records indicate the diagnosis of fibromyalgia prior to April 2007.  Tr. at 2420.

[27]Dilaudid is an opioid pain medication used to treat moderate to severe pain.  See https://www.drugs.com/dilaudid.html (last visited Mar. 20, 2024).  Soma is a muscle relaxer used with rest and physical therapy to treat skeletal muscle conditions such as pain or injury.  See https://www.drugs.com/soma.html (last visited Mar. 20, 2024). Pennsaid is a topical nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/pennsaid.html  (last visited Mar. 20, 2024).

cervical and shoulder ROM at 75% of normal with pain and spasm, MCPs ROM was 75% with pain to palpation, and the lumbar ROM was slightly decreased with pain and spasm. Id. The doctor renewed Dilaudid, and began a trial of Frova.[28] Id.

On August 25, 2015, Joel Marmar, M.D., performed a consultative Internal Medicine Examination. Tr. at 816-19. On examination, the doctor found Plaintiff's joints were stable and nontender, but that she had 14 trigger points. Id. at 818. Her strength was 5/5 in the upper and lower extremities, hand and finger dexterity was intact, and her grip strength was 5/5. Id. He diagnosed Plaintiff with fibromyalgia, anxiety and depression, keratoconus, PTCS, and noted procedures for Lap-Band and gastric bypass. Id. The doctor noted decreased range of motion in Plaintiff's knees and hips. Id. at 827. Dr. Marmar opined that Plaintiff could occasionally lift and carry up to 20 pounds. Id. at 820. He also found that in an 8-hour workday, Plaintiff could sit for 4 hours in 25 minute increments, and stand and walk for 2 hours each in 10 minute increments. Id. at 821. The doctor also found that Plaintiff was limited to only occasional use of her hands for reaching, handling, fingering, feeling, or pushing/pulling. Id. at 822.

On October 26, 2016, after the expiration of Plaintiff's insured status, she was referred to Lehigh Valley Rheumatology for fibromyalgia. Tr. at 1333. Carolyn M. Casey, D.O., noted multiple tender points, but no synovitis in Plaintiff's shoulders,

---

[28]Frova is a headache medicine that narrows blood vessels around the brain. It also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound, and other migraine symptoms. Frova will only treat a headache that has already begun. It will not prevent headaches or reduce the number of attacks. See https://www.drugs.com/mtm/frova.html (last visited Mar. 20, 2024).

elbows, wrist/hands, hips, knees, or ankles.  Id. at 1336-37.  Dr. Casey indicated that Plaintiff had given birth nine weeks earlier, which was contributing to her fatigue and poor sleep, worsening her fibromyalgia symptoms.  Id. at 1338.  The doctor added a low dose of gabapentin at bed time and referred Plaintiff for a sleep study.  Id.  On December 12, 2016, Dr. Casey noted that the dose of gabapentin at night made Plaintiff too tired, and she could not tolerate non-steroidal, anti-inflammatory drugs due to stomach upset. Id. at 1342.  The doctor prescribed Flexeril, Ultram, and gabapentin because she was tolerating it better at the time.  Id. at 1347.

Plaintiff also has a history of depression, for which Dr. Rothenberger prescribed Klonopin and Lexapro.[29]  Tr. at 759-60 (1/12/11).  On June 20, 2013, Dr. Rothenberger noted that Plaintiff had stopped all medication one-to-two weeks prior and was complaining about sleeping all day and feeling helpless and worthless.  Id. at 779.  He started Plaintiff on Wellbutrin and Xanax.[30]  Id. at 781.  On October 23, 2013, the doctor noted Plaintiff's depression was doing well on Wellbutrin, but added Paxil to address

---

[29]Klonopin is a benzodiazepine used to treat certain seizure disorder and to treat panic disorder.  See https://www.drugs.com/klonopin.html (last visited Mar. 20, 2024). Lexapro is an antidepressant.  See https://www.drugs.com/lexapro.html (last visited Mar. 20, 2024).

[30]Wellbutrin is an antidepressant.  See https://www.drugs.com/search.php?searchterm=wellbutrin (last visited Mar. 20, 2024). Xanax is a benzodiazepine used to treat anxiety disorders and anxiety caused by depression, and panic disorder.  See https://www.drugs.com/xanax.html (last visited Mar. 20, 2024).

anxiety symptoms.[31]  Id. at 782, 785.  On January 7, 2014, just prior to Plaintiff's alleged disability onset date, Dr. Rothenberger noted that Plaintiff's anxiety and depression were "much improved" on Paxil and Wellbutrin.  Id. at 786.  Plaintiff returned to Dr. Rothenberger on April 22, 2014, needing a physical because she was starting nursing school the following month.  Id. at 791.  At that time, the doctor's examination notes indicate that Plaintiff had an appropriate mood and affect and her mental health medications were Klonopin, Paxil, and Wellbutrin.  Id. at 792-93.  The next treatment note from Dr. Rothenberger is from June 8, 2015, when Plaintiff was complaining of neck pain and migraines, and chronic medical conditions.  Id. at 794.  The doctor noted that Plaintiff was again taking Paxil because she "was really bad off rx."  Id.

During the relevant period, Plaintiff participated in individual psychotherapy.[32]  Tr. at 2422-31.  The treatment notes dated March 31, 2014 through February 2, 2016, evidence discussions about anxiety regarding bariatric surgery, issues relating to Plaintiff's college courses, apprehension about her husband's new job, increased symptoms of agoraphobia, relationship challenges, infertility, and fertility treatment.  Id.

---

[31]Paxil is an antidepressant.  See https://www.drugs.com/search.php?searchterm=Paxil (last visited Mar. 20, 2024).

[32]It is unclear who provided this therapy and what credentials the treatment provider holds.  The Index identifies Dr. Laura Weissflog, see Index, 24F ("Progress Notes, dated 3/4/2014 to 2/2/2016, from Dr. Laura Weissflog"), but Dr. Rosenberger's notes indicate that Plaintiff is seeing a therapist named Laura in Chester Springs.  It also is unclear when Plaintiff began this treatment.  The first date appearing on a treatment note is March 4, 2014, but it appears that a treatment relationship already existed between patient and provider.  Id. at 2431.

On August 20, 2014, the therapist's mental status exam ("MSE") was normal, including memory, concentration, judgment, and insight.  Id. at 2426-27.

On August 25, 2015, Plaintiff underwent a consultative psychiatric evaluation with Danielle Meltzer, Psy.D.  Tr. at 806-10.  Dr. Meltzer diagnosed Plaintiff with major depressive disorder, recurrent ("MDD"), mild, and general anxiety disorder ("GAD") with panic attacks.  Id. at 809.  Plaintiff's MSE was normal, including intact attention and concentration and intact recent and remote memory skills.  Id. at 808.  Dr. Meltzer opined that Plaintiff could manage her own funds.  Id. at 809.  The doctor noted that "[r]esults of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis."  Id.

On August 31, 2015, based on her review of the record at the initial review stage, Monica Yeater, Psy.D., found that Plaintiff did not have any understanding and memory limitations, but did have limitations in sustained concentration and persistence.  Tr. at 222.  Dr. Yeater found Plaintiff was not significantly limited in her abilities to carry out very short and simple instructions and detailed instructions, and moderately limited in her ability to maintain attention and concentration for extended periods.  Id.  The doctor summarized her findings:

> [Plaintiff] is capable of working within a work schedule and at a consistent pace.  [Plaintiff] can make simple decisions.  [Plaintiff] is able to carry out very short and simple instructions.  [Plaintiff] would be able to maintain regular attendance and be punctual.

Id. at 223.  The doctor also noted that "[b]ased on review of available [medical evidence of record], it appears [Plaintiff] is capable of completing simple, routine tasks in a stable work environment."  Id.

The record also contains psychiatric treatment notes from Muhamad Rifai, M.D., who began treating Plaintiff in 2019, three years after the expiration of her insured status. Tr. at 6147-79, 6339-48.  Dr. Rifai's diagnoses included PTSD, GAD, and MDD, single episode, severe, without psychotic features.  Id. at 6151.  On March 27, 2020, the doctor noted that Plaintiff's MSE was normal and she "is doing well" with "no issues."  Id. at 6150.  On May 28, 2020, Dr. Rifai completed a Medical Opinion Re: Ability to do Work Related Activities (Mental), indicating that Plaintiff had "marked" or "extreme" limitations in the 16 abilities to do unskilled, semiskilled and skilled work, and extreme limitations in the abilities to interact with the public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation.  Id. at 6145-46.[33]

## D. **Plaintiff's Claims**

### 1. Remand Order

Plaintiff argues that the ALJ failed to comply with the Appeals Council's remand order directing the ALJ to obtain evidence from a medical expert.  Doc. 11 at 4-5; Doc. 13 at 1-2.  Defendant responds that remand to obtain medical expert evidence is not

---

[33]The record also contains treatment notes from LVPG Psychiatry from late 2018 through mid-2019.  Tr. at 6180-6231.  These also post-date the expiration of Plaintiff's insured status.

warranted because the ALJ fully evaluated the nature and severity of Plaintiff's impairments.  Doc. 12 at 7.[34]

As reviewed in the procedural history, the Appeals Council's remand order included the following directive to the ALJ:  "If available, obtain evidence from a medical expert related to the nature and severity of the functional limitations resulting from [Plaintiff]'s impairments."  Tr. at 251.  The ALJ did not obtain medical expert evidence on remand.  When Plaintiff presented her request for review in the Appeals Council the second time, Plaintiff specifically raised this issue in her brief, arguing that the ALJ failed to comply with the Appeals Council remand order directing the ALJ to obtain medical expert evidence.  Id. at 521.  The Appeals Council acknowledged the brief, but "found that the reasons [provided in the brief] do not provide a basis for changing the [ALJ's] decision."  Id. at 1.

It is unclear whether the district court has the authority to remand a case solely based on the ALJ's failure to follow a directive from the Appeals Council on remand.

> Although ALJs are required to comply with Appeals Council orders, see 20 C.F.R. § 404.977(b), courts disagree as to whether district courts are authorized to review an ALJ decision to ensure such compliance.  Compare Mor v. Kijakazi, No. CV 21-1730 (JMV), 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) (noting that some courts have found this compliance issue to be outside the scope of reviewing authority in Section 405(g) of the Act), with Lok v. Barnhart, No. CIV. A. 04-3528, 2005 WL 2323229, at *7 (E.D. Pa. Sept. 19, 2005), and Noreja v. Comm'r, SSA, 952 F.3d 1172, 1180 (10th Cir. 2020) ("As part of our review of a final

---

[34]In this section, I address only the question whether the violation of the Appeals Council's order, in and of itself, is sufficient to warrant remand.  Whether the ALJ's decision is supported by substantial evidence will be discussed later in this memorandum.

> decision under § 405(g), we may consider whether the ALJ
> complied with any legal requirements imposed by the
> Appeals Council upon remand.").

<u>Wespi v. Kijakazi</u>, Civ. No. 21-1634, 2023 WL 2265212, at *1 n.1 (W.D. Pa. Feb. 28,

2023); <u>see also</u> <u>Kissell v. Berryhill</u>, Civ. No. 17-2203, 2018 WL 4207746, at *5-6 (M.D.

Pa. Sept. 4, 2018) (collecting cases finding district court lacks authority to consider

whether ALJ complied with remand order of the Appeals Council and concluding district

court does <u>not</u> have jurisdiction to review compliance with a remand order).  These cases

have relied on 42 U.S.C. § 405(g), which limits judicial review to  "any final decision of

the Commissioner . . .  made after a hearing."  <u>Id.</u> at *5 (citing, inter alia, <u>Pearson v.

Colvin</u>, Civ. No. 14-4666, 2015 WL 9581749, at *4 (D.N.J. Dec. 30, 2015) ("The

appropriate focus for review is upon the ALJ's final decision, not the prior Appeals

Council remand order.")).

    In <u>Mor</u>, the court discussed an additional point supporting a finding that the

district court should not remand a case solely based on the ALJ's failure to follow the

Appeals Council's remand order.

> The Court finds the reasoning of the <u>Kissell</u> court to be
> persuasive.  However, Plaintiff also correctly notes that other
> district courts have found that an ALJ commits "legal error"
> if the ALJ fails to take an action ordered by the Appeals
> Council or takes action inconsistent with a remand order.
> <u>See</u>, <u>e.g.</u>, <u>David Allen S. v. Saul</u>, No. 19-cv-00376, 2021 WL
> 907103, at *5 (E.D. Wash. Mar. 9, 2021) (citations omitted).
> The Court's concern with the potential reach of such a
> conclusion is that if a court otherwise finds an ALJ's decision
> to be supported by substantial evidence, a remand based on
> such legal error would constitute an exercise in futility.

2022 WL 73510, at *6.

Finally, the <u>Kissell</u> court offered the following observation when denying a request for remand based on the ALJ's noncompliance with an Appeals Council remand order.

> At the outset, it is apparent the Appeals Council agreed that the ALJ had adequately complied with its remand order else it would not have issued its . . . denial of Plaintiff's request for review of the ALJ's decision.

2018 WL 4207746, at *5.  Similarly here, the Appeals Council, whose order is alleged to have been violated, determined that the failure to obtain medical expert evidence did not warrant remand.

I am persuaded by the reasoning of all these cases that a violation of the Appeals Council's remand order alone does not provide a basis for judicial remand.[35]

_____

[35]Plaintiff also argues that, regardless of the violation of the Appeals Council's remand order, medical expert evidence was required in this case.  Doc. 11 at 9 n.1.  I disagree.  The Social Security Ruling ("SSR") upon which Plaintiff relies requires that a finding of medical equivalence be based upon one of three types of evidence, one of which is medical expert ("ME") evidence.  SSR 17-2p, "Titles II and XVI:  Evidence Needed by Adjudicators at the Hearings and Appeals Council Levels of the Administrative Review Process to Make Findings About Medical Equivalence," 2017 WL 3928306, at *3 (Mar. 27, 2017) ("To demonstrate the required support of a finding that an individual is disabled based on medal equivalence at step 3, the record must contain one of the following:  . . . . 2. ME evidence, which may include testimony or written responses to interrogatories, obtained at the hearing level supporting the medical equivalence finding . . . .").  However, "[i]f an adjudicator at the hearing . . . believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence . . . ." <u>Id.</u> at *4.

2.    <u>Nature and Severity of Migraines</u>

Plaintiff next complains that the ALJ failed to properly consider the nature and severity of her migraines pursuant to SSR 19-4p because they have occurred with such severity and frequency as to equal the Listing of impairments and preclude work on a regular and continuing basis.  Doc. 11 at 5-10; Doc. 13 at 3-6.  Defendant responds that the ALJ evaluated Plaintiff's migraine headaches in accordance with SSR 19-4p and substantial evidence supports the finding that Plaintiff's migraines did not satisfy the requirements of a disabling impairment under Listing 11.02.  Doc. 12 at 7-11.

SSR 19-4p explains how to "evaluate primary headache disorders" at step three of the sequential evaluation.  SSR 19-4p, "Titles II and XVI:  Evaluating Cases Involving Primary Headache Disorders," 2019 WL 4169635, at *1 (Aug. 26, 2019).  "Primary headaches occur independently and are not caused by another medical condition." <u>Id.</u> at *3.  "We will not establish secondary headaches (for example, headache attributable to trauma or injury to the head or neck or to infection) as [a medically determinable impairment] because secondary headaches are symptoms of another, underlying medical condition.  We evaluate the underlying medical condition as the [medically determinable impairment]." <u>Id.</u> at  *5.  Migraines (with or without aura) are considered primary headache disorders.  <u>Id.</u> at *3.  Although there is no separate Listing for primary headache disorder, the SSR directs use of Listing 11.02 (Epilepsy) to evaluate a primary headache disorder, specifically paragraphs B and D of Listing 11.02.  <u>Id.</u> at *7.

Paragraph B of Listing 11.02 requires "[d]yscognitive seizures . . .  occurring at least once a week for at least 3 consecutive months . . .  despite adherence to prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02(B) ("Listing 11.02(B)").

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations.).

SSR 19-4p, 2019 WL 4169635, at *7.

Paragraph D of Listing 11.02 requires "[d]yscognitive seizures . . . occurring at least once every 2 weeks for at least 3 consecutive months . . .  despite adherence to prescribed treatment . . . and a marked limitation in one of the [areas of functioning]."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02(D) ("Listing 11.02(D)").

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in:  Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p, 2019 WL 4169635, at *7.

Here, the ALJ determined that Plaintiff's impairments did not medically equal Listing 11.02.

> SSR 19-4 details the requirements for finding migraines/headache disorders to be medically diagnosed impairments and the manner to evaluate whether this condition meets a listing.  There are no listings specific to migraines or headaches.  The most relevant listing is 11.02 (epilepsy) for dyscognitive seizures.  However, there is no reliable, objective evidence in the treatment records that this listing would be medically equaled, as there is no objective evidence to indicate that [Plaintiff] is unable to function or has significantly reduced functioning during a headache and that they occur with such frequency as to possibly equal listing 11.02.

Tr. at 28.  Later in the decision, the ALJ detailed Plaintiff's headache treatment during the relevant period, beginning with a PTCS headache on February 18, 2014, for which she underwent a lumbar puncture and was admitted to the hospital the next day for a headache believed to be a combination of migraine and PTCS.  Id. at 31.[36]  The migraine was controlled with Toradol, Reglan, and I/V fluids and she was started on Diamox for the PTCS.  Id. at 31-32.  At that time, Plaintiff reported having headaches about once a week, for which she took Excedrin and would lie down, resolving the headache within an hour.  Id. at 31; see also id. at 527.  The ALJ noted that when Plaintiff saw Dr. Liu in April 2014, she "endorsed headaches when reading but overall, her headaches were better."  Id. at 32; see also id. at 574 (Diamox, but no other headache medications –

---

[36]The ALJ misidentified the year of this treatment as 2018, but cited to the record identifying the actual year of 2014.  Tr. at 31 (citing id. at 525-35).

"headaches are better but she still has headaches when she reads.  These are more her 'normal' headaches [with] [n]o double vision[, n]o tinnitus.").

The ALJ also noted that when Plaintiff saw Dr. Liu in October 2014, she reported migraines occurring "at most once a month," and Dr. Liu found no evidence of PTCS and told Plaintiff to stop taking Diamox.  Tr. at 32; see also id. at 567-68.[37]  At the time of the examination, Plaintiff had a headache which she described as similar to a PTCS headache; however, Dr Liu found Plaintiff had "normal visual acuity, color vision, peripheral vision and pupil exam."  Id. at 32.  In addition, the doctor reported that Plaintiff  "has not used Imitrex often at all over the past 6/12 – managed with Excedrin and Tylenol."  Id. at 567.

The ALJ reviewed the hospital treatment notes from the end of February 2015, when Plaintiff was treated for a migraine at Paoli Hospital.[38]  "Her physical examination showed no drift and good fine finger movement.  Strength, tone, and bulk throughout were unremarkable.  Her sensory exam was normal and reflexes symmetric."  Tr. at 32-33; see also id. at 658, 660-61.  She responded well to Prednisone and was discharged, but returned the following week.  Id. at 33.  She was diagnosed with a migraine, treated with DHE, and discharged on prednisone and Imitrex.  Id. at 634.

---

[37]As noted in the medical summary, in the interim, Plaintiff was treated at Phoenixville Hospital on May 29, 2014, for a tension headache and dehydration, tr. at 2108, and on July 29, 2014, for a PTCS/tension headache, for which a lumbar puncture was performed and she was treated with Zofran and Percocet.  Tr. at 2071, 2075, 2082, 2088.

[38]Plaintiff was also seen at Paoli Hospital on February 8, 2015, for a headache. The neurological examination was normal with no motor deficit and no sensory deficit. Tr. at 678.  She was treated with I/V Fluids and Reglan and released.  Id. at 679.

The ALJ also noted that during her evaluation by Dr. Marmar on August 25, 2015, Plaintiff "endorsed headaches several times a week and said she was having one during the evaluation.  Nonetheless, she exhibited a normal gait, was in no acute distress, and her neurological exam was unremarkable."  Tr. at 33; see also id. at 817, 818.  The ALJ also noted that  "[s]ubsequent treatment and complaints of migraines . . .  were sporadic at best prior to her date last insured."  Id. at 34.

The ALJ determined that Plaintiff did not meet Listing 11.02 because Plaintiff had not established the requisite frequency of or limitations caused by her headaches.  Tr. at 28.  As noted, Listing 11.02(B) requires that the dyscognitive seizures (primary headaches) occur at least once a week for at least 3 consecutive months despite adherence to prescribed treatment, and Listing 11.02(D) requires that they occur once every 2 weeks for at least 3 consecutive months with a marked limitation in one of the areas of functioning.  Here, Plaintiff has established neither.  Other than a period in February and early March 2015, when Plaintiff had a spate of both migraine and PTCS headaches,[39] Plaintiff has not established that she suffered from headaches once a week or every other week, and certainly has not established such frequency for three consecutive months.  In

---

[39]I note that during this period, the treatment notes indicate that Plaintiff was not taking Diamox or any migraine preventatives.  Tr. at 632.  Defendant seizes upon this notation (and Dr. Marmar's report indicating that the only medication Plaintiff was taking at the time of his evaluation was Paxil) in arguing that Plaintiff does not meet Listing 11.02 because the Listing considers the frequency of migraines *during adherence to prescribed treatment*.  Doc. 12 at 10.  The ALJ did not mention Plaintiff's alleged failure to comply with treatment in determining that her headaches did not equal Listing 11.02.  Therefore, I will not consider Defendant's post hoc argument.  See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

October 2014, she reported to Dr. Liu that she experienced migraines, "at most once a month," and Dr. Liu indicated that Plaintiff's PTCS had resolved with a 61 pound weight loss.  Id. at 567-68.  The ALJ also noted that when treated by Dr. Rothenberger in 2015 and 2016, Plaintiff's "complaints were largely related to acute sinus infections."  Id. at 34; see also 1078 (6/11/15 – shoulder pain), 1077 (6/18/15 – follow up after CT, complain of worsening fatigue), 1075 (7/29/15 – needs Paxil refill), 1073 (12/16/15 – same), 1072 (2/17/16 – 12 weeks pregnant with a sinus infection), 1070 (6/22/16 – 30 weeks pregnant with sinus pressure).

Moreover, the ALJ's conclusion that the record fails to establish that Plaintiff is unable to function or has significantly reduced functioning during a headache is supported by substantial evidence.  As previously noted, SSR 19-4p requires the ALJ to consider "[a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena . . . ; the frequency of headache events; adherence to prescribed treatment; side effects of treatment . . . ; and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day . . . ."  SSR 19-4p, 2019 WL 4169635, at *7.  Here, although the ALJ noted Plaintiff's complaints of double vision, eye pain, photophobia and phonophobia, the ALJ noted that when Dr. Liu examined Plaintiff when she was experiencing a PTCS-like headache on October 6, 2014, Dr. Liu found Plaintiff had "normal visual acuity, color vision, peripheral vision and pupil exam."  Tr. at 32; see also id. at 567.  Similarly, the ALJ noted that when Dr. Marmar examined Plaintiff on August 25, 2015, the doctor indicated that Plaintiff had a migraine

at the time.  Id. at 33; see also id. at 816.  "Nonetheless, she exhibited a normal gait, was in no acute distress, and her neurological exam was unremarkable."  Id. at 33; see also id. at 817-18.  Thus, medical providers treating Plaintiff when she was experiencing both a migraine and a PTCS-like headache noted no significant limitations in her abilities.

In addition, the ALJ considered Plaintiff's activities in determining her functional abilities.  Plaintiff was able to prepare simple meals once a week, use the dishwasher, vacuum twice monthly, watch the TV for two hours a day and use the internet for two hours a day.  Tr. at 30.  These findings are supported by Plaintiff's testimony.  See tr. at 63-64, 99-103.[40]

Plaintiff cites a number of cases involving migraines in which the ALJ failed to properly consider the evidence in light of SSR 19-4p and Listing 11.02, but each is distinguishable.  In Tyson v. Kijakazi, the ALJ failed to mention or discuss SSR 19-4p or Listing 11.02.  Civ. No. 21-855, 2022 WL 3975002, at *10  (M.D. Pa. Jul. 25, 2022)  In Brown v. Kijakazi, the ALJ rejected, without explanation, the uncontroverted evidence regarding the frequency of the plaintiff's migraines and concluded without analysis that the plaintiff's headache condition was improving.  Civ. No. 20-5391, 2021 WL 5356802, at *5 (E.D. Pa. Nov. 17, 2021).  In Hrycak v. Kijakazi, the court found the ALJ failed to consider the plaintiff's limitations in the context of his migraines, cross-referencing the

---

[40]The ALJ also noted that Plaintiff testified that that although her parents and husband helped with caring for her one-year old daughter, she was able to prepare her meals, change diapers, and read to and play with her.  Tr. at 30.  The ALJ's reliance on these activities is misplaced because Plaintiff's insured status expired prior to the birth of her daughter.  See id. at 3988 (delivery August 20, 2016), 406 (DLI is June 30, 2016).

discussion of the B criteria of the mental health listings without consideration of the additional limitations imposed by the plaintiff's headaches.  Civ. No. 20-472, 2021 WL 3617863, at *10 (D. Del. Aug. 16, 2021).  Here, the ALJ relied on evidence in the record in analyzing the frequency of Plaintiff's headaches and the observations of medical providers when Plaintiff was experiencing a headache.  Therefore, I find that the ALJ's decision that Plaintiff's headaches did not meet or equal the Listings is supported by substantial evidence.

Plaintiff also argues that the ALJ erred in determining Plaintiff's RFC, citing Plaintiff's complaints and the MRI establishing "partially empty sella[41], a finding seen in the setting of idiopathic intracranial hypertension."  Doc. 11 at 9 (citing tr. at 527).  Specifically, Plaintiff claims that RFC did not account for Plaintiff's claims that she "need[s] to lie down for many hours in a dark and quiet room on multiple days per month."  Doc. 11 at 9.  I have already determined that the ALJ properly considered the evidence of record in determining that Plaintiff's headaches did not meet the frequency requirement of Listing 11.02 (once per week or once every two weeks for three consecutive months).  The same conclusion is true whether evaluating Plaintiff's headaches at the third step or in determining Plaintiff's RFC.

As for Plaintiff's claim that MRI results supported a conclusion that Plaintiff suffered from idiopathic intracranial hypertension, this is not disputed.  The ALJ determined that Plaintiff's pseudotumor cerebri was a severe impairment.  Tr. at 26.  "A

---

[41]Sella means a depression.  DIMD at 1714.

diagnosis alone . . . does not demonstrate disability." <u>Foley v. Comm'r of Soc. Sec.</u>, 349

F. App'x 805, 808 (3d Cir. 2009) (citing <u>Petition of Sullivan</u>, 904 F.2d 826, 845 (3d Cir.

1990)); <u>see</u> <u>also</u> <u>Phillips v. Barnhart</u>, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The

claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than

the functional limitations that result from that impairment.  A diagnosis of impairment,

by itself, does not establish entitlement to benefits under the Act.").  As previously

discussed, the ALJ properly considered the functional limitations imposed by Plaintiff's

migraines and PTCS headaches.

### 3. Consideration of Consultative Examiner Opinion

Plaintiff claims that the ALJ rejected the opinion of the consultative examiner for

erroneous reasons.  Doc. 11 at 10-12; Doc. 13 at 6-8.  Defendant responds that the ALJ

properly evaluated the consultative examiner's opinion and substantial evidence supports

her finding that it was entitled to partial weight.  Doc. 12 at 11-14.

Generally, the regulations in effect at the time of Plaintiff's application dictated

that an ALJ give medical opinions the weight she deems appropriate based on factors

such as whether the physician examined or treated the claimant, whether the opinion is

supported by medical signs and laboratory findings, and whether the opinion is consistent

with the record as a whole.  20 C.F.R. § 416.927(c).[42]  "The ALJ must consider all the

---

[42]Effective March 27, 2017, the Social Security Administration amended the rules
regarding the evaluation of medical evidence, eliminating the assignment of weight to
any medical opinion.  <u>See</u> Revisions to Rules Regarding the Evaluation of Medical
Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.  Because Plaintiff's
application was filed prior to the effective date of the new regulations, the opinion-
weighing paradigm and associated Social Security Rulings ("SSR") are applicable.

evidence and give some reason for discounting the evidence she rejects."  Plummer v.

Apfel, 186 F.3d 422, 429 (3d Circuit 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287,

290 (3d Cir. 1983)).  "When a conflict in the evidence exists, the ALJ may choose whom

to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Id. (quoting

Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  "Generally, the more consistent

a medical opinion is with the record as a whole, the more weight we will give to that

medical opinion."  20 C.F.R. § 416.927(c)(4).

As previously reviewed, Dr. Marmar conducted a consultative internal medical

examination and determined that Plaintiff could sit for 4 hours, and stand and walk for 2

hours each in an 8-hour day.  Tr. at 821.[43]  In addition the doctor noted that Plaintiff

could only occasionally use her hands to reach, handle, finger, feel or push/pull or use her

feet to operate foot controls.  Id. at 822.  The ALJ gave Dr. Marmar's opinion partial

weight.

> I give the opinion of Dr. Marmar partial weight as his exam
> and the record support[] a conclusion of light exertion work
> but narrowed by limited standing/walking, and some postural
> and environmental limitations.  However, there is no adequate
> basis in support of all of his findings.  For example, he finds
> occasional use of the hands for all reaching, handling,
> fingering, feeling, pushing and pulling yet observed normal
> ranges of motion within the shoulders, wrist, and elbows.  He
> also documented intact grip and upper extremity strength,
> intact sensation and reflexes, and intact hand and finger
> dexterity ([tr. at 816-27]).  [Plaintiff's] treating providers also
> observed intact strength, sensation, and reflexes ([id. at 553-

---

[43]In her brief, Plaintiff states that Dr. Marmar "opined that [she] could sit for only
four hours, and stand and walk for only two hours total in an 8-hour day."  Doc. 11 at 11.
I note that Dr. Marmar found that Plaintiff could stand and walk for two hours each.  Tr.
at 821.

600, 601-741, 948-1332, 2015-2322]).  Another example, Dr. Marmar finds only an occasional ability to operate foot controls bilaterally, while simultaneously finding her capable of continuously operating a motor vehicle, which appears internally inconsistent.  It is equally unclear as to how Dr. Marmar arrived at a total sitting tolerance of 4 hours in light of a continuous ability to drive being assessed.  While he observed some reductions in knee and hip ranges of motion and trigger points, [Plaintiff] had normal lumbar and cervical ranges of motion and stable joints.  He also observed an ability to rise from a chair without difficulty, negative straight leg raising, and no edema.  These findings in the aggregate suggest[] greater sitting tolerances.

Tr. at 35.

Plaintiff argues that because Dr. Marmar examined Plaintiff, more weight should be given to his opinion than to those of non-examining consultants.  Doc. 11 at 10-12.  There are two flaws with this argument.  First, the ALJ did not defer to any non-examining physician.  At the initial consideration level, the physical RFC assessment was completed by a single decision maker ("SDM"), tr. at 218-22, whose evaluation does not constitute medical opinion evidence.  See Rhyder v. Colvin, Civ. No. 16-884, 2017 WL 81273, at *6 (M.D. Pa. Jan. 9, 2017) (SDM opinion not entitled to any evidentiary weight); Saez v. Colvin, 216 F. Supp.3d 497, 506 n.1 (M.D. Pa. 2016) (same).  The ALJ did not mention, let alone rely on, any non-examining opinion evidence in assessing Plaintiff's physical RFC.[44]

---

[44]As will be discussed later, the mental RFC assessment provided at the initial determination level was performed by Monica Yeater, Psy.D., a state agency psychological consultant, and the ALJ considered Dr. Yeater's medical opinion in assessing the mental limitations in the RFC assessment.  Tr. at 36.

Second, the existence of an examining relationship is only one of the considerations in determining the weight to be given to a medical opinion.  20 C.F.R. § 404.1527(c).  The ALJ is also required to consider the extent to which the doctor's opinions are supported by his or her own findings.  Id. § 404.1527(c)(3).  Here, the ALJ's decision is based on the fact that Dr. Marmar's conclusions were inconsistent with his observations on examination.

I find that the ALJ's consideration of Dr. Marmar's opinion is supported by substantial evidence.  The doctor's opinion is inconsistent with his observations on examination.  Although the doctor indicated that Plaintiff had 14 trigger points, he also noted that Plaintiff's strength was 5/5 in the upper and lower extremities with no muscle atrophy, hand and finger dexterity were intact, and grip strength was 5/5 bilaterally.  Tr. at 818.  In addition, he noted that Plaintiff's activities of daily living included cooking, cleaning, doing laundry, and shopping.  Id. at 817.  He also noted that she could continuously (more than two-thirds of the time) drive.  Id. at 824.  These observations are inconsistent with his conclusions that she could sit only 4 hours a day, only occasionally operate foot controls, and occasionally reach, handle, finger, feel, and push/pull.  Id. at 821-24.  Plaintiff argues that the ALJ's consideration of the hand limitations found by Dr. Marmar "focused myopically on his findings with respect to range of motion, grip strength and dexterity, while disregarding his findings of 14 tender points including the trapezius muscles, suprascapular areas, bilateral gluteal areas, lesser clavicle, and second ribs."  Doc. 11 at 12 (citing tr. at 818).  The key is that despite finding 14 tender points, Dr. Marmar found that Plaintiff had full strength in her upper and lower extremities, full

grip strength, and her fine motor skills were intact, observations that were inconsistent

with his assessment.  Thus, I find no error in the ALJ's consideration of Dr. Marmar's

opinion.[45]

### 4.    State Agency Psychologist

Plaintiff claims that the ALJ erred by failing to include a limitation to "very short

and simple instructions" in the RFC because the ALJ gave Dr. Yeater's opinion great

weight but failed to include this limitation as found by Dr. Yeater.  Doc. 11 at 13; Doc.

13 at 8-9.  Defendant responds that the ALJ correctly evaluated Dr. Yeater's opinion.

Doc. 12 at 14-16.

The ALJ found that Plaintiff was limited to simple, routine tasks and simple work-

related decisions.  Tr. at 29; see also id. at 75 (hypothetical posed to VE).  Plaintiff

contends that Dr. Yeater, whose opinion the ALJ gave "great weight," id. at 36, found

that she "was moderately limited in her ability to maintain attention and concentration for

extended periods, and as a result was limited to carrying out very short and simple

instructions."  Doc. 11 at 13 (citing tr. at 222-23).  In the narrative section of her mental

RFC assessment, Dr. Yeater stated that "[Plaintiff] can make simple decisions [and] is

able to carry out very short and simple instructions."  Tr. at 223.  However, careful

review of Dr. Yeater's assessment reveals that she found that Plaintiff's abilities "to carry

---

[45]Plaintiff also contends that her "limitations were supported by objective medical
evidence which explained the severity and chronicity of her pain, and which did not abate
more than temporarily as a result of her treatment."  Doc. 11 at 11-12.  This argument
ignores the standard of review, which directs the court not to reweigh the evidence but to
determine whether substantial evidence supports the ALJ's findings.

our very short and simple instructions" and "to carry out detailed instructions" were
"[n]ot significantly limited," id. at 222, and she further stated in the "Additional
Explanation" section that "it appears that [Plaintiff] is capable of completing simple,
routine tasks in a stable work environment."  Id. at 223.  Thus, the ALJ did not misstate
Dr. Yeater's limitation regarding Plaintiff's ability to carry out instructions.

Moreover, an ALJ is not required to incorporate every limitation contained in a
medical opinion to which she gives great weight.  See Wilkinson v. Comm'r of Soc. Sec.,
558 F. App'x 254, 256 (3d Cir. 2014).

> [N]o rule or regulation compels an ALJ to incorporate into an
> RFC every finding made by a medical source simply because
> the ALJ gives the source's opinion as a whole "significant"
> weight.  On the contrary, the controlling regulations are clear
> that the RFC finding is a determination expressly reserved to
> the Commissioner.

Id. (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), 404.1546(c), 416.946(c)); see also
Northington v. Berryhill, Civ. No. 17-2922, 2018 WL 2172565, at *6 (E.D. Pa. Feb. 27,
2018) ("there is no requirement that by assigning great weight to the testimony of one
individual, the ALJ is necessary required to adopt every limitation articulated in that
individual's testimony"), R&R adopted, 2018 WL 2159923 (E.D. Pa. May 10, 2018);
Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) ("Surveying the medical
evidence to craft an RFC is part of the ALJ's duties.").

The limitation to simple, routine tasks and simple work-related decisions is
supported by the record.  In January 2014, just prior to Plaintiff's amended disability
onset date, Dr. Rothenberger noted that Plaintiff's "anxiety [is] much improved as is

depression" on Wellbutrin and Paxil.  Tr. at 786.  Plaintiff's mental status exam on August 20, 2024, was normal, including normal concentration and memory.  Id. at 2426. In September, 2014, Dr. Rothenberg noted that Plaintiff would be starting medication to help conceive and would need to "wean off a lot of her medications."  Id. at 1099.  A note from Dr. Rothenberger's office from May of 2015 indicated that Plaintiff called complaining that she was "anxious all the time, . . . depressed all the time, [having] trouble getting out of bed, bathing, and won't see a therapist."  Id. at 1094.  The note indicated that Plaintiff was taking Wellburtrin but was weaning off Klonopin and Paxil while working with a reproductive endocrinologist.  Id. at 1094.  Plaintiff complained of increased symptoms of agoraphobia in July 2015.  Id. at 2425.  After conducting a consultative psychiatric evaluation, Dr. Meltzer found in August 2015 that Plaintiff's attention and concentration as well as her recent and remote memory were intact.  Id. at 808.  The doctor indicated Plaintiff had a mild limitation in understanding, remembering, and carrying out simple instructions.  Id. at 811.  Thus, I conclude that the limitation to simple, routine tasks and simple work-related decisions is supported by substantial evidence.

     5.    Credibly Established Limitations

Finally, Plaintiff argues that the ALJ's improper evaluation of the evidence, as presented in the earlier claims, resulted in flawed hypothetical and RFC assessment. Doc. 11 at 13-14; Doc. 13 at 9.  Defendant responds that the ALJ included all of the limitations supported by the record in the RFC assessment and hypothetical.  Doc. 12 at 16-18.

In determining a claimant's RFC and questioning the VE, an ALJ need not include all of a claimant's alleged physical and mental impairments; rather, the ALJ need only include those limitations that are supported by evidence of record.  Moody v. Barnhart, 114 F. App'x 495, 502 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).  Here, the ALJ explained her RFC assessment.

> In sum, the [RFC] assessment is supported by the analyses of the . . . medical opinions, the objective medical evidence of record, [Plaintiff's] testimony, and documented subjective reports.  Although [Plaintiff] has some limitations due to her physical impairments, as summarized above, the record reflects that during the period under consideration, there is little objective evidence to support the severity of [Plaintiff's] alleged physical limitations, improvement is noted with treatment, and [Plaintiff's] activity level/capabilities are somewhat inconsistent with the alleged severity of her symptoms.  . . . She sought a physical in preparation of taking classes for nursing school.  She could perform a wide range of ADLs including driving, cooking, self-care, and light cleaning.  Her neuroophthalmologist Dr. Liu impressed relative control over her intracranial pressure type headaches during the relevant period.  Her usual migraines were less severe and did not significantly interfere with her ability to function on a sustained basis prior to the date last insured.  Her headache symptoms did not yield neurological manifestations on physical exam that would interfere with work such as discoordination, cranial deficits, or weakness.  . . . Nonetheless, in consideration of her fatigue, pain, body habitus, effects of headaches, spasms, tenderness, and some reduction of ranging in the hips and knees seen during the consultative exam, I have restricted her to sedentary work [with additional limitations].

Tr. at 36-37.

Specifically, Plaintiff complains that the ALJ's failure to include all of the limitations found by Dr. Marmar results in a flawed RFC assessment.  Doc. 11 at 14.  I

addressed Plaintiff's complaints about the ALJ's consideration of Dr. Marmar's assessment earlier in this opinion and concluded that the ALJ properly evaluated Dr. Marmar's assessment.  See supra at 33-36.  In addition, Plaintiff contends that the ALJ failed to include limitations caused by Plaintiff's migraine headaches.  Doc. 11 at 14.  I addressed the ALJ's consideration of Plaintiff's headaches earlier in this opinion when addressing the allegation that the ALJ should have found that Plaintiff's headaches met or equaled the applicable Listing, and concluded that the ALJ properly considered the evidence concerning Plaintiff's headaches.  See supra at 24-33.

IV.   **CONCLUSION**

The ALJ's alleged violation of the remand order of the Appeals Council does not, in an of itself, provide a basis for remand.  The ALJ's consideration and analysis of Plaintiff's headaches is supported by substantial evidence without the need for medical expert testimony.  The ALJ properly considered the opinions of the consultative examiner and the state agency psychologist in crafting the RFC assessment.  The ALJ included the credibly established limitations in the RFC assessment and the hypothetical posed to the VE.

An appropriate Order follows.